# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JONATHAN MITCHELL<br>405 Brier Avenue<br>Wilmington, DE 19805 | : <br> : <br> : <br> : Civil Action No.: |
| **Plaintiff** | : |
| **vs.** | : <br> : JURY TRIAL DEMANDED |
| THE GLEN MILLS SCHOOLS<br>185 Glen Mills Road<br>Glen Mills, PA 19342 | : <br> : <br> : <br> : |
| **Defendant** | : |

# COMPLAINT

## INTRODUCTORY STATEMENT

1. Plaintiff, Jonathan Mitchell, brings these claims for discrimination against his former employer, Defendant, The Glen Mills Schools, pursuant to the Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII")[1] and avers that the Defendant discriminated and/or took adverse employment actions against him on the basis of his race, namely African-American, by:

    (a). terminating his employment while permitting similarly-situated Caucasian employees to keep their jobs;

    (b). falsely accusing him of failing to adhere to child-abuse laws and regulations of the Commonwealth of Pennsylvania, while

---

[1] Mr. Mitchell also dual-filed his claims of discrimination against Defendant, Glen Mills School, with the Pennsylvania Human Relations Commission ("PaHRC") under the Pennsylvania Human Relations Act ("PaHRA"). But as the statutorily-required term of one-year from the charge filing date with the PaHRC has not expired, *43 P.S. § 962(c)(1)*, Mr. Mitchell is currently unable to pursue those claims in this matter. But pursuant to this Court's supplemental jurisdiction, Mr. Mitchell intends on moving to amend this Complaint and add his PaHRA claims to this matter after they have been administratively exhausted.

allowing and/or permitting similarly-situated Caucasian employees to violate child-abuse laws and regulations of the Commonwealth of Pennsylvania;

(c). falsely accusing him of conspiring to cover-up an incident of child abuse;

(d). intentionally and/or deliberately holding similarly-situated Caucasian employees to a different standard of behavior and discipline in the workplace;

(e). intentionally, recklessly, and/or negligent permitting, condoning and/or allowing similarly-situated Caucasian employees to violate the child-abuse laws and regulations of the Commonwealth of Pennsylvania, including but not limited to, reporting an incident of child abuse; and

(f). Improperly classifying and/or identifying Plaintiff based upon his race.

2. This action has been brought to redress the violations of Plaintiff's rights as secured by Title VII and he seeks all the damages and remedies available to him under that laws and its regulations.

## THE PARTIES

3. Plaintiff, Jonathan Mitchell ("Mitchell"), is an adult individual who resides at 405 Brier Avenue, Wilmington, Delaware, 19805.

4. Defendant, The Glen Mills Schools, ("GMS"), is, through information and belief, a non-profit corporation or other business entity organized and incorporated under the laws of the Commonwealth of Pennsylvania that regularly conducts, and is authorized to regularly conduct, business in Pennsylvania, and which maintains its corporate nerve

center and principal place of business at 185 Glen Mills Road, Glen Mills, PA 19342.

5. At all times material and relevant to the allegations in this Complaint, Defendant, GMS, acted and/or failed to act by and/or through its duly designated officers, directors, shareholders, principals, employees and/or agents.

6. At all times material and relevant to the allegations in this Complaint, Defendant, GMS, operated a school that provided educational and residential services to court-referred, at-risk minors located at 185 Glen Mills Road, Glen Mills, PA 19342 ("the School").

7. At all times material and relevant to the allegations in this Complaint, Defendant, GMS, employed Mitchell at the School as a Senior Counselor.

## JURISDICTION

8. This Court has original jurisdiction over Mitchell's claims under Title VII pursuant to 28 U.S.C. § 1331 (federal question jurisdiction).

## VENUE

9. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), as all of the acts, events or omissions giving rise to Mitchell's claims occurred within this judicial district—specifically, at the School operated by Defendant, GMS.

## ADMINISTRATIVE EXHAUSTION

10. On or about December 8, 2017, Mitchell filed a Charge of Discrimination against Defendant, GMS, with the Equal Employment Opportunity Commission ("EEOC"), in which he charged Defendant, GMS, with discrimination under Title VII on the basis of his race.

11. On or about July 21, 2018, the EEOC issued Mitchell a "Dismissal and Notice of Rights" letter.

12. Mitchell has thus fulfilled all of the administrative

prerequisites to commencing the present lawsuit under Federal law.

## FACTUAL ALLEGATIONS

13. Mitchell incorporates by reference paragraphs one through 12, as though fully set forth at length.

14. Mitchell worked for Defendant, GMS, at the School for approximately six years until his termination on June 29, 2017.

15. During his tenure as a Senior Counselor at the School, Mitchell was a model employee with no history of discipline.

16. At approximately 5:30 PM on June 7, 2017, Mitchell was on-campus at the School dropping his children off to his wife when he received a phone call from a staff member in the unit he supervised.

17. The staff member informed Mitchell that an incident had just occurred with student "M.A.," in which M.A. had made inappropriate comments about a staff member's family and was verbally confronted by the staff.

18. The staff member informed Mitchell that M.A. did not respond appropriately to the verbal confrontation and began swinging his fists and kicking his feet at staff members, which resulted in the staff needing to physically restrain him.

19. Mitchell proceeded directly back to the unit and three staff members informed Mitchell that M.A. was out of control, had attempted to assault a staff member, and that during a physical restraint, had fallen and hit his face on a table.

20. Upon his arrival at the unit, Mitchell isolated M.A.

21. At that time, Mitchell noticed some minor swelling and redness on M.A.'s face and asked him whether he was injured and how those marks got there.

22. M.A. told Mitchell that he was not hurt and that during the physical restraint, he had pulled away from a

4

staff member, lost his balance, and fell into a wooden end table, striking his face.

23. Mitchell again asked M.A. if he was hurt and needed medical attention; M.A. again said he was okay.

24. Mitchell then called Jim Rostick ("Rostick")—another Senior Counselor assigned to that unit.

25. Mitchell informed Rostick that a physical restraint had occurred with M.A. and that M.A. had some visible marks on his face.

26. Mitchell then separated one of the staff members involved in the incident with M.A., and instructed the remaining staff to take the rest of the students back to the floor to get ready for bed.

27. After issuing those instructions to his staff, Mitchell waited with M.A. until Rostick arrived.

28. While waiting with M.A., Mitchell gave him a peanut butter-and-jelly sandwich, which M.A. ate in Mitchell's presence with no apparent pain or difficulty.

29. During the time Mitchell was with M.A., he did not complain to Mitchell about being in any pain or discomfort, nor did he make any claims to Mitchell about abuse by any staff member.

30. Mitchell stayed with M.A. until Rostick arrived at the unit.

31. At approximately 6:30 PM on June 7, 2017, Rostick arrived on the unit and interviewed all the staff members.

32. Mitchell believes, and therefore avers, that all the staff members told Rostick that during the physical restraint, M.A. had pulled away from a staff member, lost his balance, and fell into a wooden end table, striking his face.

33. After Rostick finished interviewing the staff, he came into the classroom with Mitchell and interviewed M.A.

34. M.A. reported to Rostick that the abrasions on his face occurred when he lost his balance and fell into a table

during the physical restraint.

35. During his conversation with Rostick, M.A., did not report any incidents of assault by any staff members.

36. After he finished interviewing M.A., Rostick called Defendant, GMS's, Group Living Director, Tim Fox, who informed Rostick to contact the on-call nurse and follow up with the Defendant, Cosgrove.

37. Rostick then called Defendant, GMS's, Assistant Group Living Director, Sean Cosgrove ("Cosgrove"), informed him of what had occurred, the presence of abrasions on M.A.'s face, and how they reportedly occurred.

38. Rostick also asked Cosgrove whether they should call the Pennsylvania Department of Human Services ("DHS") Child Abuse Hotline ("the Hotline").

39. Cosgrove told Rostick that they did not need to call the Hotline.

40. At or around the same time, Mitchell called the School's nurse and let her know that M.A. had small abrasions on his face from the incident, but had eaten a sandwich and was not complaining about being in any pain or discomfort.

41. The nurse instructed Mitchell to give M.A. three Ibuprofen, ice, and send him to bed.

42. Rostick and Mitchell then informed Cosgrove via text message that they had contacted the on-call nurse and of her instructions.

43. Cosgrove responded via text-message: "OK. Ice his ass up."

44. Mitchell then obtained the medication and ice for M.A., and stayed with him until approximately 10:45 PM, when he directed M.A. to shower and go to bed.

45. At no time on June 7, 2017 did M.A. ever make any claims to Mitchell or Rostick regarding any mistreatment or abuse by staff members.

46. On the morning of June 8, 2017, Rostick again interviewed M.A. about the previous night's events.

6

47. During the June 8, 2017 interview, M.A. for the first time alleged that he had been slapped, punched, and stepped on by unit staff during the physical restraint the night before.

48. On the basis of that additional information, Rostick called the Hotline on June 8, 2017, spoke with a DHS agent, and reported M.A.'s claims of alleged abuse.

49. Once it was informed and/or learned of the fact that Rostick had called the Hotline, Defendant, GMS, conducted an internal investigation into the alleged abuse of M.A. on June 7, 2017 ("the M.A. incident").

50. Mitchell actively participated in, and was a part of, Defendant, GMS's, investigation into the M.A. incident.

51. At no time during the investigation into the M.A. incident did Defendant, GMS, ever accuse or allege that Mitchell had failed to report any allegations of child abuse.

52. At no time during the investigation into the M.A. incident did Defendant, GMS, ever accuse or allege that Mitchell had attempted to cover up or conceal allegations of staff abuse or mistreatment of M.A.

53. On or about June 15, 2017, Defendant, GMS, terminated five staff members in Mitchell's unit who were working during the M.A. incident, none of whom were Senior Counselors.

54. Mitchell then continued to work without incident or problem until June 26, 2017.

55. On June 26, 2017, Defendant, GMS, placed Mitchell on administrative leave without pay claiming it was investigating him with regard to the M.A. incident.

56. When Mitchell was placed on administrative leave, Defendant, GMS, stated that it needed to speak with Rostick, who was away on vacation at that time.

57. Mitchell believes, and therefore avers, that Defendant, GMS, subsequently falsely reported to DHS that Mitchell had violated DHS reporting regulations on June 7, 2017 with respect to the M.A. incident, and that

Mitchell had attempted to coerce M.A. into telling a false story.

58. On June 29, 2017, Defendant, GMS, terminated Mitchell's employment, claiming that he had failed to call the Hotline on June 7, 2017 and report a child abuse incident involving M.A.

59. Mitchell believes, and therefore avers, that Defendant, GMS, terminated Mitchell's employment before it spoke with Rostick about the M.A. incident.

60. Defendant, GMS, never terminated Rostick for failing to call the Hotline on June 7, 2017 to report a child abuse incident involving M.A.

61. Rostick is Caucasian.

62. Another Caucasian Senior Counselor—Tom Sheehan—witnessed some or all of the events of the M.A. incident on June 7, 2017.

63. Defendant, GMS, knew, suspected, or should have known or suspected that Tom Sheehan witnessed some or all of the events of the M.A. incident on June 7, 2017.

64. Defendant, GMS, however, never terminated Tom Sheehan's employment for allegedly failing to call the Hotline on June 7, 2017 to report a child abuse incident involving M.A.

65. Since June 7, 2017, Defendant, GMS, has promoted Tom Sheehan.

66. Mitchell believes, and therefore avers, that Defendant, GMS, has a history, pattern, and/or practice of treating Caucasian staff members better in terms of discipline for incidents involving students than similarly-situated African-American employees.

THE A.W. INCIDENT

67. On or about July 19, 2018, a Caucasian Senior Counselor and a Hispanic Senior Counselor punched and choked student A.W. at the School ("the A.W. incident.")

68. The A.W. incident was captured on surveillance footage.

69. No Senior Counselor called the Hotline on July 19, 2018 in reference to the A.W. incident.

70. The A.W. incident was not reported to the Hotline until approximately 13 hours after it occurred.

71. Mitchell believes, and therefore avers, that when Defendant, GMS, first heard and/or learned about the A.W. incident, it tried to cover it up.

72. Mitchell believes, and therefore avers, that Defendant, GMS, initially provided false and/or incomplete information to DHS about the A.W. incident, including an edited and/or shortened version of the surveillance footage to DHS.

73. Following the A.W. incident, Defendant, GMS, immediately terminated the employment of a Hispanic Senior Counselor involved in the A.W. incident, but it did not immediately terminate a Caucasian Senior Counselor's employment even though Defendant, GMS, knew about, suspected, and/or should have known about or suspected that the Caucasian Senior Counselor had also physically and criminally assaulted A.W., and/or witnessed the events of the A.W. incident, but did not call the Hotline.

74. Defendant, GMS, only terminated the Caucasian Senior Counselor's employment when pressured to do so as a result of the DHS investigation in to the A.W. incident.

75. The surveillance footage of the A.W. incident shows that other Caucasian employees witnessed the A.W. incident—including James Lindquest—but failed to call the Hotline or otherwise report the A.W. incident.

76. Defendant, GMS, did not terminate the employment of all the other Caucasian employees.

THE 2018 INCIDENT

77. In or around March of 2018, a student complained to his mother during a family-facilitated visit that a Caucasian Senior Counselor had grabbed him and choked him by his hoodie.

78. No one from Defendant, GMS, called the Hotline

about this incident until the student's mother reported it to Defendant, GMS.

79. Defendant, GMS, never terminated the Caucasian Senior Counselor about whom the student complained.

80. That Caucasian Senior Counselor continues to work at the School and Defendant, GMS, permitted him to keep his School-provided on-campus housing.

THE OCTOBER 2017 INCIDENT

81. In or around October of 2017, an employee of Defendant, GMS, pushed a student against a plate-glass window during a physical restraint, causing the window to break and the student to receive stitches in his back.

82. The on-call Caucasian Senior Counselor assigned to that unit failed to arrive on campus until approximately three hours after being informed that the incident had occurred, in derogation of Defendant, GMS's, established protocol and procedure for alleged incidents of physical restraints and/or child abuse.

83. Defendant GMS, never took any disciplinary action against that Caucasian Senior Counselor and he still works at the School.

THE JULY / AUGUST 2017 INCIDENT

84. In or around July or August of 2017, Defendant, GMS, was told, suspected, knew and/or should have suspected or known, that staff members were providing students with narcotics and allowing them to smoke the narcotics in the unit building.

85. Defendant, GMS, was told, suspected, knew and/or should have suspected or known that the Caucasian Senior Counselor in the unit was aware of that behavior.

86. Defendant, GMS, never disciplined the Caucasian Senior Counselor in the unit who was aware of that behavior.

87. All those Caucasian staff members still work at the School.

10

THE JUNE 2017 INCIDENTS

88. On or about June 30, 2017, a staff member pushed a student, causing the student to injure his head so severely that he needed medical attention and staples.

89. The Caucasian Senior Counselor in charge failed to report to the unit when advised of that incident, in derogation of Defendant, GMS's, established protocol and procedure for alleged incidents of physical restraints and/or child abuse.

90. Defendant, GMS, never disciplined that Caucasian Senior Counselor and he still works at the School.

91. On or about June 19, 2017, staff members of Defendant, GMS, failed to follow procedures and account for a student every 15 minutes as required.

92. As a result, a student escaped from the School, caused damage to property in the surrounding neighborhood, and robbed a local Wawa store.

93. Defendant, GMS, never disciplined any of the Caucasian Senior Counselors who were in charge of that unit.

94. Those Caucasian Senior Counselors still work at the School.

95. In or around June of 2017, several students in a living unit claimed they had been mistreated by a Caucasian Senior Counselor and notified Defendant, GMS's, Executive Director by placing a letter under his office door.

96. Defendant, GMS, failed and/or refused to conduct an adequate and/or timely investigation into those allegations, and simply transferred the Caucasian Senior Counselor's unit assignment, but did not otherwise discipline him.

THE DECEMBER 2016 INCIDENTS

97. In or around December of 2016, a Caucasian Team Leader at the School physically restrained a student, causing the student to receive a head injury that required

medical attention and staples.

98. Defendant, GMS, never disciplined that Caucasian Team Leader, and he still works at the School.

99. In or around December of 2016, a student reported to a Caucasian Senior Counselor that he felt unsafe in his unit because he believed other students were planning to assault him.

100. The Caucasian Senior Counselor took no action in response to the student's claim, as required by Defendant, GMS, policies, procedures, and/or protocol.

101. A few days later, the student was assaulted by other students and was injured.

102. Defendant, GMS, never took any disciplinary action against the Caucasian Senior Counselor for failing to report and/or act on the student's complaint and he is still employed at the School.

THE 2016 INCIDENT

103. In or around the Summer of 2016, a Caucasian Senior Counselor failed to properly monitor and account for students in derogation of Defendant, GMS's, established protocols and/or procedures.

104. As a result, two students snuck off the residential floors to a communal area in a unit and fought each other.

105. During that fight, one student suffered a broken hand and the other a broken jaw.

106. Defendant, GMS, never disciplined any member of the management team for that unit, all of whom were Caucasian.

THE 2015 INCIDENT

107. Sometime in 2015, two students were left unattended in the unit by staff members in violation of Defendant, GMS, protocols and/or procedures.

108. As a result, those students snuck out of their unit and stole a staff member's car.

109. Defendant, GMS, never disciplined any of the

Caucasian Senior Counselors who were in charge of that unit and responsible for overseeing the staff

110. Both of those Caucasian Senior Counselors continue to work at the School.

THE 2014 INCIDENT

111. Sometime in 2014, a student received a broken elbow during a physical restraint and accused a Caucasian staff member of mistreatment and abuse.

112. Defendant, GMS, provided and/or paid for an attorney to represent the Caucasian staff member and defended his actions.

113. Defendant, GMS, never disciplined that Caucasian staff member in any way following those allegations of mistreatment and abuse.

114. That Caucasian Senior Counselor still works at the School.

THE 2012 INCIDENT

115. In or around 2012, a Senior Counselor came onto the School campus on a day he was not scheduled to work, and physically restrained and injured a student in violation of Defendant, GMS, policies, procedures, and/or protocols.

116. The following morning, a Caucasian Senior Counselor noticed that the student had marks on him and began to question how he was injured.

117. The Caucasian Senior Counselor then began to interview staff and discovered that another Senior Counselor had come onto the School campus on his day off and injured the student.

118. The Caucasian Senior Counselor never called the Hotline to report that another Senior Counselor had injured a student.

119. The Caucasian Senior Counselor eventually admitted to Defendant, GMS, that he had learned another Senior Counselor had come onto the School campus on his

day off and injured a student, never called the Hotline to report it, and had actually attempted to cover up the matter.

120.    Defendant, GMS, never terminated that Caucasian Senior Counselor.

121.    Defendant, GMS, allowed and permitted that Caucasian Senior Counselor to retain his on-campus housing, School-provided phone, and rate of pay.

122.    That Caucasian Senior Counselor still works at the School.

THE 2003 INCIDENT

123.    In or around 2003, a student received a broken jaw and accused Caucasian staff members of assaulting him.

124.    Cosgrove was a "Team Leader" of that unit at the time of that incident.

125.    Defendant, GMS, did not terminate any Caucasian Senior Counselors accused of assaulting that student.

126.    Following that incident, Defendant, GMS, promoted Cosgrove.

127.    In addition to the above, Mitchell believes other instances exist of Defendant, GMS, failing and/or refusing to terminate or otherwise discipline similarly-situated Caucasian staff members who failed or refused to adhere to DHS reporting requirements and/or who failed or refused to follow Defendant, GMS, policies, procedures, and/or protocols.

## COUNT I—DISCRIMINATION (RACE)
### TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
### (42 U.S.C. §§ 2000e, *et seq.*)

### JONATHAN MITCHELL V. THE GLEN MILLS SCHOOLS

128.    Mitchell incorporates by reference paragraphs one through 127, as though fully set forth at length.

129.    At all times material and relevant to the

allegations in this Complaint, Defendant, GMS, had or employed 15 or more employees for each working day in twenty or more weeks in the 2017 and 2016 calendar years.

130. At all times material and relevant to the allegations in this Complaint, Defendant, GMS, was an "employer" as defined by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b).

131. At all times material and relevant to the allegations in this Complaint, Mitchell was an "employee" of Defendant, GMS, as that term is defined by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(f).

132. Defendant, GMS's, allegation and/or report to DHS that Mitchell had failed to report an instance of child abuse was false.

133. Defendant, GMS's, termination of Mitchell's employment as a Senior Counselor at the School was because of, on the basis of, and/or motivated by his race (African-American), because similarly-situated Caucasian Senior Counselors involved in the M.A. incident were not terminated.

134. Defendant, GMS, has a pattern, practice, and/or history of treating Caucasian employees more fairly than similarly-situated African-American employees.

135. Defendant, GMS's, proffered reason(s), excuse(s), and/or justification(s) for terminating his employment were false and/or pretextual.

136. Defendant, GMS's, actions toward Mitchell, as set forth above, were intentional and/or willful.

137. As a direct result of Defendant, GMS's, false accusations about him to DHS and its termination of his employment, Mitchell suffered a substantial loss of salary and benefits, including but not limited to:

(a). Lost wages;

(b). Lost health insurance benefits for himself and his family;

(c). Lost eligibility for free, on-campus housing for himself and his family;

(d). Lost tuition reimbursement eligibility; and

(e). Lost eligibility for future private-school tuition assistance for his children.

138. As a direct result of Defendant, GMS's, false accusations about him to DHS and its termination of his employment, Mitchell also suffered severe emotional and mental suffering, distress, anxiety, and humiliation, for which he needed professional medical treatment.

139. Mitchell thus seeks all the rights and remedies available to him under Title VII of the Civil Rights Act of 1964 and applicable regulations, including compensatory and punitive damages, declaratory and injunctive relief, attorneys' fees and costs, interest, delay damages, and costs of suit.

**WHEREFORE**, Plaintiff, Jonathan Mitchell, respectfully requests for this Honorable Court to enter judgment in his favor and against Defendant, The Glen Mills Schools, and award him damages in excess of One Hundred Fifty Thousand Dollars ($150,000) for past lost wages and employment benefits, lost future wages and employment benefits, compensatory damages, punitive damages, declaratory and injunctive relief, attorneys' fees and costs, interest, delay damages, and all other such relief that this Honorable Court deems necessary, proper, or just. Mitchell demands a jury trial.

Respectfully Submitted,

By: _____
        MICHAEL J. DAVEY, ESQUIRE

**ECKELL, SPARKS, LEVY,
AUERBACH, MONTE, SLOANE,
MATTHEWS & AUSLANDER, P.C.
PA I.D. No. 200506
300 W. State Street, Ste. 300
Media, PA 19063
Phone #: (610) 565-3700
Fax #: (610) 565-1596**
mdavey@eckellsparks.com

Attorney for Plaintiff


**DATED: October 15, 2018**

17